UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
DEBORAH PAESANO and ANTHONY
PAESANO,

                                    Plaintiffs,                    **OPINION & ORDER**

        - against -                                                 No. 19-CV-10979 (CS)

ETHICON, INC., JOHNSON & JOHNSON, and
JOHN DOES 1-20,

                                    Defendants.
------------------------------------------------------------x

Appearances:

Thomas G. Cascione
Cascione Purcigliotti & Galluzzi, P.C.
Eastchester, New York
*Counsel for Plaintiffs*

Maha M. Kabbash
Riker, Danzig, Scherer, Hyland & Perretti, LLP
Morristown, New Jersey
*Counsel for Defendants Ethicon, Inc. and Johnson & Johnson*

Seibel, J.

        Before the Court is the motion for summary judgment of Defendants Ethicon, Inc. and

Johnson & Johnson (collectively, "Ethicon").  (ECF No. 38.)  For the following reasons, the

motion is GRANTED.

## I.      **BACKGROUND**

        This case arises out of injuries experienced by Plaintiff Deborah Paesano that she

attributes to Defendants' wrongful conduct in connection with the development, design,

manufacture, marketing, distribution, and sale of Ethicon's pelvic mesh products – specifically,

the Gynemesh PS mesh device and TVT mesh mid-urethral sling – that were implanted in Ms. Paesano's body to treat medical conditions.

A.    **Facts**

The following facts are based on Defendants' Local Civil Rule 56.1 statement, (ECF No. 38-3 ("Ds' 56.1 Stmt.")), Plaintiffs' response thereto, (ECF No. 39-2 ("Ps' 56.1 Resp.")), and supporting materials, and are undisputed except as noted.

1.    **Initial Visit and Implantation**

In July 2008, urogynecologist Dr. Robert Lobel diagnosed Ms. Paesano with "pelvic organ prolapse involving a third-degree cystocele and rectocele, fourth-degree enterocele, and vaginal vault prolapse, as well as levator (pelvic floor) weakness and urethral hypermobility." (Ds' 56.1 Stmt. ¶ 1.)  In layman's terms, her bladder, rectum, and small intestine had fallen into her vaginal vault, and her small intestine was protruding through the vaginal opening, while her bladder and rectum "were coming to the opening."  (ECF No. 38-2 Ex. B ("Lobel Depo.") at 54:14-56:13.)[1]  These conditions resulted in her experiencing urinary incontinence, constipation, vaginal pain, and sexual dysfunction.  (Ds' 56.1 Stmt. ¶ 2.)  On January 19, 2009, Dr. Lobel implanted Ethicon's Gynemesh PS mesh device and an AlloDerm acellular dermis graft to treat Ms. Paesano's pelvic organ prolapse, and Ethicon's TVT mesh mid-urethral sling to address her urinary incontinence.  (*Id.* ¶ 3.)  He understood that short-term or long-term vaginal or pelvic

---

[1] Dr. Lobel's deposition appears at pages 29-72 of ECF No. 38-2.  Citations to page numbers are to the page numbers of the deposition transcript, not the numbers assigned by the Court's Electronic Case Filing ("ECF") system.

pain, and pain with intercourse, were risks of surgery using those products.  (*Id.* ¶¶ 18-20, 23-24, 27-29.)  He also was aware that a fistula[2] was an infrequent but possible risk.  (*Id.* ¶¶ 36-37.)

### 2.     September 4, 2009 Visit to Dr. Lobel's Office

On September 4, 2009, Ms. Paesano returned to Dr. Lobel's office and reported that she had been experiencing pain and bleeding during intercourse.  (*Id.* ¶ 4.)  The clinical notes from that visit, prepared by members of Dr. Lobel's staff, (Lobel Depo. at 123:12-124:7), state that Ms. Paesano's gynecologist –Dr. Sitara Choudhury, (ECF No. 38-2 Ex. G at 206)[3] – "told [Ms. Paesano] the mesh had eroded [through her] vag[ina]," (ECF No. 38-2 Ex. C at 74),[4] and that Dr. Choudhury "was worried about an abscess and sent her for CT (which came back neg[ative]) and put her on [antibiotics] and told her to come [to Dr. Lobel's office]," (*id.*).  Ms. Paesano denies being told by Dr. Choudhury that the mesh had eroded through her vagina.  (Ps' 56.1 Resp. ¶ 6; *see* P Depo. at 113:6-17.)

During this visit, the nurse practitioner who examined Ms. Paesano observed a "red friable area" at the top of her vagina and noted, "Palpation causes [patient] discomfort.  Some bleeding noted."  (ECF No. 38-2 Ex. C at 74; Ds' 56.1 Stmt. ¶ 7.)  Dr. Lobel testified that the "Gynemesh would certainly [have been] a prime culprit here."  (Lobel Depo. at 128:3-23; Ds' 56.1 Stmt. ¶ 8.)  The notes include the assessment, "possible erosion of vaginal mesh."  (ECF

---

[2] "A fistula is an abnormal tunnel or connection between two organs."  (Lobel Depo. at 140:22-141:4.)

[3] This page citation is to the page number generated by the ECF system.  Dr. Choudhury has passed away, (ECF No. 38-2 Ex. D ("P Depo.") at 103:5-10), and the parties were unable to obtain the medical records she maintained, (ECF No. 40 ("Ds' Reply") at 7 n.6).  Ms. Paesano's deposition, (P Depo.), appears at pages 76-136 of ECF No. 38-2.  Citations to page numbers are to the page numbers of the deposition transcript, not the numbers assigned by the ECF system.

[4] The notes from Ms. Paesano's September 4, 2009 visit appear at ECF-generated page 74 of ECF No. 38-2.

No. 38-2 Ex. C at 74.)  Plaintiff testified that she has no memory of being informed of that

assessment.  (P Depo. at 114:5-21.)[5]  The notes further state that the nurse practitioner discussed

various treatment options with Ms. Paesano, including "vaginoscopy to further investigate the

cause of her symptoms, doing nothing, or possible surgery."  (Ds' 56.1 Stmt. ¶ 9).  Ms. Paesano

was hesitant to get additional surgery, so she opted for pelvic rest and estrogen cream.  (*Id.*)

      Ms. Paesano testified that she experienced vaginal pain, which "was never good after the

surgery," although "the bowel wasn't hanging out of me anymore."  (P Depo. at 105:5-14.)  She

experienced painful intercourse, bleeding, and difficulty starting her urine stream in the months

following the implant procedure, (Ds' 56.1 Stmt. ¶ 10), and sex had been painful since she

resumed having sex in May 2009 after the surgery, (*id.* ¶¶ 5, 11-12.)

### 3.    Post-2009 Treatment

      In 2011, Ms. Paesano met with Dr. Ronald Dinsmore, the gynecologist who took over Dr.

Choudhury's practice, and reported experiencing ongoing vaginal pain and burning.  (Ds' 56.1

Stmt. ¶ 13; P Depo. at 103:23-104:15.)  Dr. Dinsmore prescribed antibiotics after examining her

and finding that her vagina was inflamed due to an infection.  (P Depo. at 103:23-104:20.)  On

October 12, 2015, Ms. Paesano saw Dr. Bernadette Tillmon, a primary care physician, for an

annual checkup, (ECF No. 38-2 Ex. E at 138),[6] and reported vaginal burning, (Ds' 56.1 Stmt. ¶

14).  Ms. Paesano testified that at this time, she was still experiencing the same pain with

intercourse she had reported in 2009 and 2011.  (P Depo. at 121:24-122:10.)  According to Dr.

---

     [5] Plaintiffs in their 56.1 response cite to Ms. Paesano's deposition and the deposition of
Mr. Paesano, her husband and co-Plaintiff, (Ps' 56.1 Resp. ¶ 9), but neither party provided Mr.
Paesano's deposition with their motion papers.

     [6] Dr. Tillmon's notes from Ms. Paesano's October 12, 2015 visit appear at pages 138-41
of ECF No. 38-2, and page references are to the page numbers generated by the ECF system.

Tillmon's notes from this visit, Plaintiff was experiencing "[v]aginal discomfort/burning which she attributes to mesh."  (ECF No. 38-2 Ex. E at 138.)

On October 8, 2018, Ms. Paesano saw Dr. Steven Helft, a gastroenterologist.  (ECF No. 39-1 Ex. 1 at 4.)[7]  She reported "a single episode of passage of fecal material through the vagina" in May 2018 and "[s]ince then . . . ha[d] been passing air through the vagina suggestive of rectovaginal fistula."  (*Id*.)  On October 18, 2018, Ms. Paesano saw Dr. Cornelius Verhoest, a urogynecologist, who suspected Ms. Paesano had a fistula between her vagina and either the small intestine or the large intestine.  (ECF No. 39-1 Ex. 5 ("Verhoest Depo.") at 25:21-26:9, 26:14-27:13, 30:22-32:14.)[8]  He referred Ms. Paesano to Dr. Asna Amin, a rectal surgeon, to undergo a right colectomy and possibly a small bowel resection to fix her fistula.  (*Id*. at 32:18-33:9.)

In January 2019, Ms. Paesano underwent a diagnostic laparoscopy conducted by Dr. Amin, to whom she reported symptoms, worsening over the last couple of months, of stool and gas exiting from her vagina.  (ECF No. 39-1 Ex. 3 at 12.)[9]  During the same procedure, Dr. Amin conducted a "low anterior resection, splenic flexue mobilization, takedown of colovaginal fistula, [and] primary anastomosis" to repair Ms. Paesano's colovaginal fistula.  (*Id*.; *see* P Depo. at 93:20-24.)

_____

[7] Dr. Helft's notes from Ms. Paesano's October 8, 2018 visit appear at pages 4-7 of ECF No. 39-1, and page references are to the page numbers generated by the ECF system.

[8] Dr. Verhoest's deposition appears at pages 18-46 of ECF No. 39-1.  Citations to page numbers are to the page numbers of the deposition transcript, not the numbers assigned by the ECF system.

[9] Dr. Amin's notes from Ms. Paesano's January 21, 2019 procedure appear at pages 12-13 of ECF No. 39-1, and page references are to the page numbers generated by the ECF system.

On October 21, 2019, Ms. Paesano reported to Dr. Verhoest that she still had stool coming out of her vagina. (Verhoest Depo. at 56:4-7.) Dr. Verhoest concluded that the earlier surgery had failed and that it would have to be repeated, this time removing more of the mesh and possibly a good portion of Ms. Paesano's vagina. (*Id.* at 57:16-58:13, 61:5-63:1.) Ms. Paesano testified that Dr. Verhoest told her that mesh erosion had caused the fistula. (Ds' 56.1 Stmt. ¶ 16.) On November 14, 2019, Dr. Verhoest and Dr. John Choi removed the fistula and put in an ileostomy. (P Depo. at 49:12-50:3; Verhoest Depo. at 67:15-18; ECF No. 39-1 Ex. 7 at 51.)[10]

### B.    Procedural History

Plaintiffs filed this lawsuit in New York Supreme Court, Dutchess County, on September 24, 2019, and amended their complaint the next day. (ECF No. 1 at 2.) Defendants removed the case to this Court on November 27, 2019. (*Id.*)

On December 4, 2019, Defendants Ethicon, Inc. and Johnson & Johnson filed a pre-motion letter seeking leave to file a partial motion to dismiss Plaintiffs' Amended Complaint. (ECF No. 4.) Plaintiffs, on December 9, 2019, filed a responsive letter in which they proposed a motion to remand. (ECF No. 9.) On December 10, 2019, Dr. Lobel and his practice submitted a pre-motion letter, (ECF No. 12), and on January 2, 2020, Ethicon responded to Plaintiff's December 9, 2019 letter, (ECF Nos. 14-15). At a pre-motion conference on January 10, 2020, a schedule for the motions to dismiss and remand was set. (*See* Minute Entry dated Jan. 10, 2020.) On April 2, 2020, the claims against Dr. Lobel and his practice were dismissed by stipulation. (ECF No. 20.) On April 15, 2020, the remaining parties stipulated to the dismissal of eleven

---

[10] The notes from Ms. Paesano's November 14, 2019 procedure appear at pages 50-55 of ECF No. 39-1, and page references are to the page numbers generated by the ECF system.

claims, leaving the following:  (1) negligence, (2) strict liability – failure to warn, (3) strict liability – design defect, (4) gross negligence, (5) punitive damages, and (6) loss of consortium. (ECF No. 24.)

Plaintiffs filed another Amended Complaint on April 17, 2020.  (ECF No. 27).)[11] Defendants answered on April 30, 2020.  (ECF Nos. 28-29.)  On January 28, 2021, following discovery, Defendants submitted a pre-motion letter seeking leave to file a motion for summary judgment.  (ECF No. 35.)  Plaintiff responded, (ECF No. 37), and the Court held a pre-motion conference and set a briefing schedule, (Minute Entry dated Feb. 11, 2021).  The instant motion followed.  (ECF Nos. 38-40.)

## II.   <u>LEGAL STANDARD</u>

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "[T]he dispute about a material fact is 'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A fact is "material" if it "might affect the outcome of the suit under the governing law . . . .  Factual disputes that are irrelevant or unnecessary will not be counted."  *Id.*  On a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Id.* at 255.

The movant bears the initial burden of demonstrating "the absence of a genuine issue of material fact," and, if satisfied, the burden then shifts to the non-movant to "present evidence sufficient to satisfy every element of the claim."  *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d

_____

[11] The Amended Complaint dropped Gynecare and Ethicon Women's Health and Urology as Defendants.

Cir. 2008).  "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]."  *Anderson*, 477 U.S. at 252.  Moreover, the non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and "may not rely on conclusory allegations or unsubstantiated speculation," *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001) (cleaned up).

"A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials . . . ."  Fed. R. Civ. P. 56(c)(1).  Where a declaration is used to support or oppose the motion, it "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the . . . declarant is competent to testify on the matters stated."  *Id.* 56(c)(4); *see Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 310 (2d Cir. 2008).  "If a party fails . . . to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion" or "grant summary judgment if the motion and supporting materials – including the facts considered undisputed – show that the movant is entitled to it."  Fed. R. Civ. P. 56(e).

III.   **DISCUSSION**

A.   **The Applicable Statute of Limitations**

This action was removed based on the diversity of citizenship, (ECF No. 1 at 4-13; AC ¶ 13), and a New York federal court sitting in diversity "must apply the New York choice-of-law

rules and statutes of limitations." *Stuart v. Am. Cyanamid Co.*, 158 F.3d 622, 626 (2d Cir. 1998). Plaintiffs are residents of New York, and the underlying events occurred here, so their claims are subject to New York's statutes of limitations. *See Baker v. Skyler Corp.*, 770 F. App'x 12, 14 (2d Cir. 2019) (summary order).

Under New York law, "the general limitations period for personal injury torts, including personal injury and survival actions, based on negligence, strict liability, gross negligence and loss of consortium is three years measured from date of the injury." *In re Pfohl Bros. Landfill Litig.*, 68 F. Supp. 2d 236, 246 (W.D.N.Y. 1999) (citing N.Y. C.P.L.R ("CPLR") 214(5)), *vacated on other grounds*, *Freier v. Westinghouse Elec. Corp.*, 303 F.3d 176 (2d Cir. 2002); *see Victorson v. Bock Laundry Mach. Co.*, 37 N.Y.2d 395, 399-400 (1975) ("[T]he period of limitation with respect to [strict products liability] claims begins to run at the date of injury . . . ."); *see also Kwas v. Intergraph Gov't Sols.*, No. 15-CV-5897, 2016 WL 4502039, at *2 (E.D.N.Y. Aug. 24, 2016) (statute of limitations begins to run "when the product first injured the plaintiff, and the accrual date does not change as a result of continuing consequential damages"). The cause of action accrues, and the statute of limitations begins to run, at the time of injury, "even if the plaintiff is unaware that he or she has a cause of action" at that time. *Woodlaurel, Inc. v. Wittman*, 606 N.Y.S.2d 39, 40 (App. Div. 1993). "The rationale is that the injury puts the putative plaintiff on inquiry notice and, therefore, charges him or her with responsibility for investigating, within the limitations period, all potential claims and all potential defendants." *Zimmerman v. Poly Prep Country Day Sch.*, 888 F. Supp. 2d 317, 337 (E.D.N.Y. 2012) (cleaned up).

"In cases involving the malfunction of medical devices implanted or inserted into the human body, the statute of limitations runs from the date of the injury resulting from the

malfunction." *Baker*, 770 F. App'x at 14 (cleaned up).  Accordingly, "[t]he three year limitations period runs from the date when plaintiff first noticed symptoms, rather than when a physician first diagnosed those symptoms, so the significant date is when plaintiff began experiencing symptoms, not when [a doctor] diagnosed them." *Galletta v. Stryker Corp.*, 283 F. Supp. 2d 914, 917 (S.D.N.Y. 2003).

**B.     Date of Plaintiff's Injury**

Plaintiffs filed this action on September 24, 2019.  Thus, for their claims to be timely, Ms. Paesano's injury must have occurred on or after September 24, 2016.

Defendants assert that Plaintiffs' claims are time-barred because Ms. Paesano's injuries occurred before that date.  (ECF No. 38-1 ("Ds' Mem.") at 1-2.)  They highlight four potential events as possibilities for the date of injury:  (1) August 2009, when Ms. Paesano was allegedly told that her mesh eroded through her vagina and she may have an abscess, and was referred back to Dr. Lobel; (2) September 4, 2009, when Ms. Paesano met with Dr. Lobel's nurse practitioner, reported having pain and bleeding with intercourse and deep vaginal pain, and was informed of the possible erosion of the vaginal mesh; (3) 2011, when Ms. Paesano met with Dr. Dinsmore and complained of experiencing vaginal pain and burning since her implant surgery in 2009; or (4) October 2015, when Ms. Paesano saw Dr. Tillmon and reported symptoms of vaginal burning.  (*Id*. at 2-3)

Plaintiffs argue that it is the "manifestation of her fistula" in 2018 that was Ms. Paesano's "first notice that she had a serious condition" related to the implantation of the mesh.  (ECF No. 39 ("Ps' Opp.") at 3.)  Plaintiffs concede that Ms. Paesano suffered what they characterize as "a relatively minor post-op complication of mesh 'erosion' which caused her to have a tender area in her vagina and resulted in discomfort during sex . . . . within months of her 2009 surgery."

(*Id.* at 4.)  But, they argue, she suffered "a new, serious and very different complication" in 2018 "when she first experienced fecal matter passing from her vagina and then a foul discharge and vaginal flatulence."  (*Id.*)  Calling this "'mesh erosion' and pretend[ing] that it was one and the same condition," Plaintiffs argue, "would be inaccurate and unjust."  (*Id.*)  Plaintiffs contend that the 2018 symptoms were "not a continuation of her lesser complication . . . but w[ere] a distinct and new condition that put her on notice for the first time that she had suffered a grave injury which merited investigation and suit."  (*Id.* at 6.)

These arguments fail under New York law, which provides that the statute of limitations in products liability cases "begins to run when the product first injured the plaintiff," *Perciballi v. Ethicon, Inc.*, No. 20-CV-5178, 2021 WL 810339, at *4 (E.D.N.Y. Mar. 3, 2021) (cleaned up) – that is, "from the date when plaintiff first noticed symptoms," *Galletta*, 283 F. Supp. 2d at 917; *see Baker*, 770 F. App'x at 14 (plaintiff's claim was time-barred because he consistently complained of pain that was "radically different" from the pain he experienced before his surgery and that began almost immediately after the medical device was implanted into his jaw).  "If 'the onset of the process traceable to the [device], which is claimed to have caused plaintiff's injury, began more than three years before the commencement of the action, the defendant will be entitled to dismissal of the entire complaint on Statute of Limitations grounds.'"  *Guisto v. Stryker Corp.*, 293 F.R.D. 132, 136 (E.D.N.Y. 2013) (quoting *Fitzpatrick v. A.H. Robins Co.*, 470 N.Y.S.2d 414, 415 (App. Div. 1984)).

Here, that onset was in 2009.  Ms. Paesano started experiencing vaginal and pelvic pain, discomfort, and burning sensations, and pain and bleeding with sexual intercourse within three to four months after her surgery in January 2009.  (P Depo. at 105:5-106:3, 108:4-16, 111:18-22.) She suffered from vaginal pain – having an "uncomfortable, irritated feeling in [her] vagina" –

from 2009 on, starting around three months after the implant procedure.  (*Id*. at 105:5-18.)

Additionally, Ms. Paesano experienced pain during sex – "being uncomfortable, pressure and

just feeling bloated" – around the same time.  (*Id*. at 105:19-106:3.)  Ms. Paesano testified that

the pain with sexual intercourse was ongoing since the surgery, (*id*. at 108:4-16), and that she

experienced bleeding with intercourse as well, (*id*. at 111:14-22.)  Ms. Paesano described this

pain with intercourse as being "on the left side of [her] vagina up at the top, and it just felt

raw. . . .  Just sore. . . .  [And] pain was deep inside and on the side."  (*Id*. at 112:11-113:5.)

Further, Ms. Paesano complained of often experiencing burning in her vagina starting within

three to four months after the surgery.  (*Id*. at 192:23-193:3.)  According to Dr. Tillmon's notes

from October 2015, Ms. Paesano was experiencing "[v]aginal discomfort/burning which she

attribute[d] to mesh."  (ECF No. 38-2 Ex. E at 138.)

As in *Guisto*, "[i]f [Plaintiffs] are to avoid the applicable three-year statute, any of the

continuous pain [and burning Ms. Paesano] felt before [the September 24, 2016] cutoff date

could not have been caused by, or traceable to, the [mesh], that is to say . . . the claimed defect."

293 F.R.D. 132, 136*.*  But here, those years of pain, bleeding, and burning are traceable to the

mesh and mark the onset of the process that culminated in the fistula.  While the latter is more

dramatic, "[i]t is a settled principle that once a compensable injury has occurred, the time within

which an action may be commenced may not be extended merely by the aggravation, or

exacerbation, of that injury by continued contact with the same offending product."  *Coughlin v.

Int'l Bus. Machs. Corp*., 650 N.Y.S.2d 477, 480 (App. Div. 1996).

The New York Court of Appeals has acknowledged that sometimes "early symptoms"

may be "too isolated or inconsequential to trigger the running of the Statute of Limitations," *In

re N.Y. Cnty. DES Litig.*, 89 N.Y.2d 506, 514 n.4 (1997), but this analysis is only pertinent to

personal injuries "caused by the latent effects of exposure to any [toxic] substance," N.Y.

C.P.L.R. 214-c, not cases like Ms. Paesano's, dealing with the malfunction of a medical device,

*see Baker*, 770 F. App'x at 15 ("Governing case law holds that [Plaintiff's] injury [from an

allegedly defective jaw implant] does not arise from latent exposure to a substance within the

meaning of § 214-c and, therefore, this provision does not save [Plaintiff's] claim."); *Guisto*, 293

F.R.D. at 137 (CPLR § 214-c did not apply because plaintiffs' case was not based on harmful

exposure or latent disease from an implant but instead involved "physical pain and discomfort

resulting from a defective or malfunctioning device").  Even if the "early symptom" inquiry were

appropriate in a case like this, Ms. Paesano's early symptoms would not be considered "too

isolated or inconsequential" to provide notice of an injury, since they were not minor, resulted in

numerous complaints to her doctors, and continued and worsened over time.  *See Fathi v. Pfizer

Inc.*, No. 06-CV-109841, 2009 WL 2950876, at *2 (N.Y. Sup. Ct. Aug. 31, 2009) (plaintiff's

symptoms were not "too isolated or inconsequential," as he experienced ongoing burning

sensations, and "that his condition was subsequently diagnosed and ultimately worsened d[id]

not make his claim timely"); *Braunscheidel v. Stryker Corp.*, No. 12-CV-1004, 2013 WL

1337013, at *5 (N.D.N.Y. Mar. 29, 2013) (plaintiff's symptoms were not "too isolated or

inconsequential" since he first noticed "new and different pain" symptoms following his

shoulder surgery and consistently had issues with his shoulder that have "progressively

worsened").  Like the plaintiff in *Baker*, who repeatedly complained of pain starting soon after

his surgery, *see* 770 F. App'x at 14-15, Ms. Paesano complained of pain and burning repeatedly

over the years following her procedure.

    It is therefore undisputed that within months of her surgery in 2009, and certainly within

a year, Ms. Paesano was experiencing new symptoms that she had not experienced before (*i.e.*,

vaginal discomfort, burning, pelvic pain, and pain and bleeding with intercourse).  While pain

may be a known risk of mesh implantation, experiencing pain that was different in kind than

before the surgery and suffering other serious symptoms were sufficient to put Ms. Paesano on

notice, well before she suffered the fistula, that she might be suffering from an injury from the

procedure and that she ought to investigate any potential claim.  *See Guisto*, 293 F.R.D. at 137

("The allegation that plaintiffs only learned of the device's lack of ingrowth and fixation in

March 2011 is immaterial; they were aware of the pain that flowed, allegedly, from the defect

even if they did not know its source.").  Since this date was well before September 24, 2016,

Plaintiffs' claims are time-barred.[12]

That her symptoms worsened and eventually resulted in the fistula, while most

unfortunate, does not extend her time to sue, because "[u]nder New York law, neither erroneous

diagnoses or progressive deterioration of a patient's condition tolls the statute of limitations."

*Ferreri v. McGhan Med. Corp.*, No. 95-CV-6189, 1997 WL 580714, at *3 (S.D.N.Y. Sept. 17,

1997); *see Naples v. Acer Am. Corp.*, 970 F. Supp. 89, 93 (D.R.I. 1997) (because plaintiff first

started experiencing symptoms well outside the statute of limitations period, plaintiff's claims

arising from use of defendant's product were time-barred under CPLR § 214, and not extended

---

[12] There are fact issues as to whether Ms. Paesano was told in 2009 of the possibility that the mesh was the problem, but Defendant did not raise, and therefore Plaintiffs did not address, Dr. Tillmon's chart indicating that Ms. Paesano attributed her symptoms to the mesh in 2015.  If the chart is accurate, it is clear that Ms. Paesano not only recognized her symptoms well before September 24, 2016, but understood before that date that they were connected to the mesh.  The latter connection is not required to start the running of the limitations period, *see Perciballi*, 2021 WL 810339, at *5 ("It is discovery of the physical condition and not the more complex concept of discovery of both the condition and the nonorganic etiology of that condition that starts the statute of limitations clock.") (cleaned up); *Guisto*, 293 F.R.D. at 137 (finding plaintiff's claims were time-barred because, regardless of when she learned of the device's specific malfunction, she began experiencing pain in and around her hip almost immediately after her surgery and continuously for at least four years), but if the connection was made, the conclusion that the claims are time-barred is that much stronger.

via § 214-c); *Baker v. Porex Corp.*, No. 16-CV-3422, 2018 WL 1440311, at *6 (E.D.N.Y. Mar.

22, 2018) ("[Plaintiff's] discovery of his symptoms immediately after his August 22, 2006

surgery and those symptoms' persistence for approximately six years thereafter serve as

insuperable bars to his ability to press his claims now."), *aff'd sub nom.*, *Baker v. Stryker Corp.*,

770 F. App'x 12 (2d Cir. 2019); *see also Hartey v. Ethicon, Inc.*, No. 04-CV-5111, 2006 WL

724554, at *4 (E.D. Pa. Mar. 20, 2006) ("If we were to hold [that later symptoms amounted to a

new injury] under the facts presented here, we would create a concept in the law which would

permit an injured plaintiff to have a new limitations period commence for the initiation of an

action for personal injuries as of the date when each complication or change in condition arose,

despite the fact that no 'new' negligence has occurred which is attributable to the defendant.")

(cleaned up).[13]

The Court sympathizes with Ms. Paesano and her husband, as they have undoubtedly

suffered.  But the law's adherence to the purposes of statutes of limitations – "finality, certainty

and predictability," *ACE Sec. Corp. v. DB Structured Prods., Inc.*, 25 N.Y.3d 581, 593 (2015) –

can sometimes result in harsh outcomes.  This is one of those times, but "this Court cannot shirk

---

[13] Plaintiffs' effort to paint the fistula as a new and different injury justifying a restart of the limitations period would fail even under CPLR § 214-c.  While that statute has an exception called the "two-injury" rule, which "recognizes the accrual of a new cause of action . . . where a single exposure [to a toxic substance] has resulted in separate and distinct injuries," it does not apply where the second injury is "the outgrowth, maturation or complication of the original contamination."  *Suffolk Cnty. Water Auth. v. Dow Chem. Co.*, 991 N.Y.S.2d 613, 621 (App. Div. 2014) (cleaned up).  The fistula here is an "outgrowth, maturation or complication" of the same problem that caused the pain, burning, and other symptoms that Ms. Paesano began experiencing in 2009, and thus does not start the statute of limitations anew.  *See Olmstead v. Bayer Corp.*, No. 17-CV-387, 2017 WL 3498696, at *5 (N.D.N.Y. Aug. 15, 2017) (two-injury rule did not apply where plaintiff experienced pain in 2013 from implant of birth control device, which continued until 2016 when the device protruded through the wall of her uterus, and the protrusion was an outgrowth, maturation or complication of the original injury).

its duty to apply the law as written." *Petroholding Dominicana, Ltd. v. Gordon*, No. 18-CV-1497, 2019 WL 2343658, at *9 (S.D.N.Y. June 3, 2019).[14]

## IV.     <u>CONCLUSION</u>

For the reasons stated above, Defendants' motion for summary judgment is GRANTED. The Clerk of Court is respectfully directed to terminate the pending motion, (ECF No. 38), enter judgment for Defendants, and close the case.

**SO ORDERED.**

Dated:  March 22, 2022
        White Plains, New York

_____
CATHY SEIBEL, U.S.D.J.

---

[14] Because Plaintiffs' claims for punitive damages and loss of consortium are derivative of Ms. Paesano's personal injury claims, they are also time-barred and dismissed. *See Webb v. Zimmer, Inc.*, No. 14-CV-1106, 2019 WL 438361, at *17 (E.D.N.Y. Feb. 4, 2019) ("As the Court has dismissed the Plaintiff's underlying substantive . . . claims, the Defendants are entitled to summary judgment as to the related punitive damage claim."); *Dunham v. Covidien LP*, No. 19-CV-2851, 2019 WL 6341179, at *7 (S.D.N.Y. Nov. 27, 2019) ("As loss of consortium is a derivative claim, [plaintiff's] loss of consortium claims survive only to the extent that [plaintiff's] claims do."); *Reed v. Medford Fire Dep't Inc.*, 806 F. Supp. 2d 594, 606 (E.D.N.Y. 2011) ("A loss of consortium is a derivative action that depends on the viability of the primary case of action . . . .").